UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
UNITED STATES OF AMERICA,

          - v.-                         17-cr-719 (JGK)

JAQUAN DEAS,                    MEMORANDUM OPINION
                                     AND ORDER
                    Defendant.
------------------------------------

JOHN G. KOELTL, District Judge:

The defendant, Jaquan Deas, was indicted on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Deas now moves to suppress certain evidence related to this charge -- namely two statements he made in which he admitted to possessing a firearm, and a firearm seized by the Government from his residence -- because, Deas argues, that evidence was obtained in violation of the Fourth and Fifth Amendments.

On March 13, 2018, the Court held an evidentiary hearing in this matter. The defense presented two witnesses, the defendant and the defendant's fiancée, Jazmin Santiago. The Government presented three witnesses, New York City Police Department ("NYPD") Officers Daniel Wadolowski and Rosa Montesdeoca and NYPD Sergeant Isaias Martinez.

Based on all of the evidence, the Court makes the following findings of fact and reaches the following conclusions of law.

On September 23, 2017, while monitoring social media posts as part of his responsibilities as a field intelligence officer, Officer Wadolowski observed a Snapchat video in which a black male in his mid-20s appeared to blow marijuana smoke into a dog's mouth. Tr. 10-14. The man in the video had a distinctive appearance: he had dyed blonde hair, some facial hair, and tattoos on his face. Tr. 13. Officer Wadolowski showed the video to his supervisor, Sergeant Martinez, who "strongly believed" that the video showed the man blowing marijuana smoke into the dog's face. Tr. 110. Officer Wadolowski preserved the video so that if he saw the man from the video while patrolling, Officer Wadolowski could ask him about it. Tr. 13.

Six days later, on September 29, 2017, Officer Wadolowski received a phone call and text messages from a resident in the 32nd Precinct (the "Resident") reporting that, earlier in the day in the vicinity of West 147th Street and 7th Avenue, the Resident had seen a gun fall out of a man's pocket when the man went to pick up a child. Tr. 17. The Resident described the man as a black male in his mid-20s, about six feet tall, with dyed blonde hair and wearing yellow faded jeans. Tr. 17. The Resident had previously provided reliable information to Officer Wadolowski on at least two occasions. Tr. 16-17, 54. Officer Wadolowski canvassed the area around West 147th Street and 7th Avenue but did

not observe anyone matching the description provided by the Resident. Tr. 18.

Later that day, when Officer Wadolowski was again in that area, the Resident informed him that the man with the gun had returned to the vicinity and was walking north on 7th Avenue. Tr. 18-19. Officer Wadolowski went to that area and saw a man, whom Officer Wadolowski identified at the evidentiary hearing as the defendant, who fit the description provided by the Resident. Tr. 19. Officer Wadolowski took a photo of the man and sent it to the Resident, who confirmed that it was the man the Resident had seen earlier in possession of a gun. Tr. 20. Officer Wadolowski observed the man, who was walking with a child and another male, for one to two minutes before the man entered a building at 220 West 149th Street. Tr. 21. The defense does not dispute that the man described by the Resident and observed and photographed by Officer Wadolowski on September 29, 2017 was the defendant. Officer Wadolowski told Sergeant Martinez what the Resident had told him and what Officer Wadolowski had observed. See Tr. 21, 113.

On the morning of October 13, 2017, the defendant voluntarily went to the stationhouse of the NYPD's 32nd Precinct because his fiancée, Ms. Santiago, was being processed for an arrest that had taken place earlier that day. Tr. 60, 115, 167-68, 188-89. At around 10:00 a.m. Officer Wadolowski observed

the defendant, whom he recognized as the six-foot-tall black male in his mid-20s with dyed blonde hair from the Snapchat video from September 23 and from canvassing on September 29, in the waiting area of the precinct. Tr. 9, 22, 24-25. The defendant was wearing yellowish jeans, as he had when Officer Wadolowski observed him on September 29. Tr. 9. Officer Wadolowski told Sergeant Martinez that the man Officer Wadolowski had observed on the two prior occasions was in the precinct. Tr. 25. Officer Wadolowski then spoke with Officer Montesdeoca, the officer who had arrested Ms. Santiago, who told Officer Wadolowski the defendant's name. Tr. 26. Officer Wadolowski then ran the defendant's name on the NYPD's computer system, from which he learned that the defendant was on parole for robbery. Tr. 26, 115.

Officer Wadolowski and Sergeant Martinez (the "Officers") approached the defendant in the precinct's waiting area, where the defendant was seated. Tr. 26, 27. The Officers asked the defendant for his name, which the defendant provided. Tr. 27. The Officers then told the defendant that they had information indicating that he might have a firearm and asked if the defendant was carrying anything that he should not have. Tr. 28 207-08. The defendant replied, "Why would I have anything on me in a precinct?" Tr. 208. The Officers then patted down the defendant for weapons. Tr. 208. During the pat down, which began

4

with the defendant seated, the defendant was agitated and the Officers grabbed him by the arms. Tr. 28, 117, 143. The Officers asked the defendant to stand up so that they could pat down his waist and the small of his back. Tr. 117. After the pat down, the defendant sat back down. Tr. 28, 117, 143.

After the pat down, Officer Wadolowski showed the defendant the Snapchat video Officer Wadolowski had preserved. Tr. 29, 117. The defendant admitted that he was the man in the video. Tr. 209. The defendant asked the Officers if they were going to notify his parole officer. Tr. 30, 119, 211. Sergeant Martinez said "come talk to me over here," and motioned with his hand for the defendant to follow him. Tr. 120; see Tr. 200-01. The defendant followed the Officers, carrying a dark colored jacket in his hands. Tr. 122, 125-126.

The Officers led the defendant to the "muster" room, located between 30 and 75 feet from the waiting area on the ground floor of the precinct. Tr. 32, 122. The muster room is a large room with windows, vending machines, computers, and tables that is used by the officers of the 32nd Precinct for roll call and briefing officers on assignments. Tr. 33, 123; GX G, K. In the muster room, the defendant sat at a table with his back to a wall and the Officers on either side of him. Tr. 34-35, 124. The defendant was not handcuffed in the muster room. Tr. 35, 125.

The defendant again asked if the Officers would allow him to inform his parole officer about the Snapchat video. Tr. 36-37, 126. The Officers told the defendant that they were not going to show the Snapchat video to the defendant's parole officer and that they were more concerned about the information they had received about the defendant possessing a firearm. See Tr. 36-37, 126. The defendant admitted to possessing the firearm, and told the Officers that the gun was located at his residence inside a bedroom dresser. Tr. 36-37, 126. The Officers explained that either the defendant could cooperate and sign a consent form allowing the Officers to search his residence, or the Officers could obtain a search warrant. Tr. 37, 127. The Officers explained further that if they obtained a search warrant and searched the residence while the defendant's fiancée, Ms. Santiago, was home, Ms. Santiago could also be liable for the firearm. Tr. 37, 127. The Officers also explained that if children were present when they conducted the search and found the firearm, the Officers would have to notify the New York City Administration for Children's Services ("ACS"). Tr. 38, 127.

The defendant told the Officers that Ms. Santiago had nothing to do with the firearm. Tr. 130. The Officers responded that if the defendant signed a consent for them to search the residence, Ms. Santiago would not be implicated because the

information the Officers had was specific to the defendant. Tr. 130. The defendant took a couple of seconds to think about his options and then agreed to sign a consent to search form on the condition that the Officers not tell his parole officer. Tr. 130. Sergeant Martinez asked Officer Waller, who was in the muster room at the time, to retrieve a consent to search form. Tr. 130. After Officer Waller retrieved the consent to search form, Officer Wadolowski read the consent to search form to the defendant and explained it. Tr. 40. At about 10:25 a.m., the defendant and Officer Wadolowski, Officer Waller, and Sergeant Martinez each signed the consent to search form. Tr. 40, 130-31, 203; GX E. The consent to search form authorized the NYPD to search the defendant's residence located at 220 West 149th Street, Apartment 33. GX E. In total, the conversation between the defendant and the Officers in the muster room lasted about 30 minutes. Tr. 40, 131, 202, 216.

After the defendant signed the consent to search form, the Officers informed him that they were going to handcuff him before driving him to the residence to retrieve the firearm. Tr. 41, 132. At approximately 10:45 a.m., the Officers arrived at the defendant's residence at 220 West 149th Street. Tr. 41, 134. The defendant provided the Officers with his keys, which the Officers used to enter the residence. Tr. 43. Inside the residence, the defendant directed the Officers to a dresser in

7

the first bedroom, from which the Officers retrieved a firearm.
Tr. 134. At approximately 11:00 a.m., the Officers placed the
defendant under arrest. Tr. 44. The defendant tried to initiate
a conversation with Sergeant Martinez, but Sergeant Martinez had
Officer Wadolowski take the defendant into the hall. Tr. 135.
Sergeant Martinez testified that, having confirmed it was a real
firearm, any further conversation should be conducted in the
detective squad office after the defendant was Mirandized. Tr.
135.

The Officers drove the defendant back to the 32nd Precinct.
Tr. 44, 135. The defendant was taken to an interrogation room in
the detective squad area and read his Miranda rights, which the
defendant waived. Tr. 44, 222-23; see Tr. 135. Prior to the
interview, Officer Wadolowski gave the defendant food, soda, and
a cigarette. Tr. 225. At approximately 12:00 p.m., a detective
interviewed the defendant with Officer Wadolowski present. Tr.
45-46. Officer Wadolowski did not ask any questions during the
interview. Tr. 46. The defendant told the detective and Officer
Wadolowski that the firearm recovered from his residence was
his, and that he had the firearm for self-protection because he
had been assaulted by individuals in his neighborhood. Tr. 46.

## II.

The defendant now moves to suppress the statements he made
in the muster room and after he was arrested, as well as the

8

firearm recovered from his residence, because, the defendant argues, the Government obtained this evidence in violation of his rights under the Fourth and Fifth Amendments. More specifically, the defendant argues that: (i) the initial pat down in the 32nd Precinct was an illegal seizure in violation of the Fourth Amendment; (ii) moving the conversation to the muster room amounted to a de facto arrest in violation of the Fourth Amendment; (iii) the statements he made in the muster room were fruit of the previous Fourth Amendment violations and were in response to a custodial interrogation where, in violation of the Fifth Amendment, he had not been advised of his Miranda rights; (iv) he did not voluntarily consent to the search of his apartment; and (v) the Government obtained his post-arrest statements using a prohibited deliberate two-step circumvention of Miranda.

**A.**

The defendant argues that the Officers illegally detained and searched him during the initial pat down in the waiting area of the 32nd Precinct. The Government responds that the Officers had a reasonable suspicion that the defendant may have been armed based on Officer Wadolowski's investigation on September 29.

Police officers may stop a person and conduct a protective frisk for weapons, commonly called a "Terry stop," where there

9

is a reasonable suspicion based on articulable facts that the person may be armed. See United States v. Bailey, 743 F.3d 322, 332-333 (2d Cir. 2014); Terry v. Ohio, 392 U.S. 1 (1968). Courts determine whether a reasonable suspicion existed based on the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18 (1981).

The Officers in this case plainly had a reasonable suspicion that the defendant may be armed when they observed him in the waiting area of the precinct. Officer Wadolowski had received a tip from a reliable source that a person matching the defendant's description possessed a firearm about two weeks earlier. Officer Wadolowski was able to corroborate several of the details from that source, including the suspect's description, location, and that he was walking with a child. Even when a tip comes from an anonymous source, "[p]olice verification of the 'innocent' factors of a tip lends support to a reasonable suspicion determination, because it would be reasonable for the police to believe that the allegations of illegality will be true as well." United States v. Walker, 7 F.3d 26, 31 (2d Cir. 1993). Here, where the tipper was known, had provided reliable information in the past, and Officer Wadolowski was able to verify several of the "innocent factors" of the tip, the Officers' suspicion that the defendant might still be armed when he entered the 32nd Precinct was plainly

reasonable. See United States v. Bold, 19 F.3d 99, 104 (2d Cir. 1994) ("Where the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation.").

The defendant contends that Officer Wadolowski's two-week old investigation was "stale," but it was reasonable for Officer Wadolowski to conclude that a person known to have a firearm while walking with what appeared to be his family just a few weeks earlier would still be in possession of that firearm. See United States v. Tisdol, No. 05-cr-260, 2006 WL 2547432, at *6 (D. Conn. Aug. 31, 2006), aff'd, 290 F. App'x 384 (2d Cir. 2008) (six-week old information that suspect possessed a firearm not stale for purposes of probable cause determination).

Moreover, before the Officers approached the defendant in the precinct, Officer Wadolowski investigated further, learning that the defendant was on parole for robbery. And when the Officers asked the defendant if he had anything that he should not, the defendant did not answer the question directly and became agitated. Tr. 208. The Officers acted responsibly and entirely reasonably by approaching the defendant and briefly patting him down for weapons when they recognized him in the waiting area of the police station.

11

**B.**

The defendant also argues that moving the conversation from the waiting area to the muster room constituted a de facto arrest without probable cause in violation of the Fourth Amendment. This argument is unpersuasive. First, the evidence demonstrates that moving the conversation to the muster room did not constitute a de facto arrest. Moreover, the Officers had probable cause to arrest the defendant based on the Snapchat video and the evidence they had collected indicating that the defendant had possessed a firearm in violation of 18 U.S.C. § 922(g)(1).

In support of the argument that the defendant was subject to a de facto arrest in the muster room, the defendant relies primarily on the allegation that the Officers handcuffed him in the waiting area and brought him to the muster room against his will. However, the evidence presented at the evidentiary hearing convincingly showed that the Officers did not handcuff the defendant in the waiting area. The only evidence that the defendant was handcuffed was his own testimony and the testimony of his fiancée, Ms. Santiago. However, both testified inconsistently. While the defendant now contends that he was forcibly moved to the muster room against his will, at the hearing he conceded that he voluntarily followed the Officers to the muster room to continue discussing the Snapchat video and

whether the Officers were going to alert his parole officer. Tr. 201. Ms. Santiago testified that she could see the defendant in handcuffs from her location in a holding cell. Tr. 189. But Ms. Santiago testified that the Officers took the defendant upstairs, even though it is uncontested that the muster room is on the ground floor of the precinct. Tr. 190.[1] Each of Officers Wadolowski, Montesdeoca, and Sergeant Martinez testified credibly that the defendant was not handcuffed in the waiting area and that the defendant carried his dark colored jacket to the muster room, which he could not have done in handcuffs. See Tr. 32, 121-22; GX F. There is no dispute that the defendant was not handcuffed in the muster room, and the photograph of the defendant in the muster room shows that he was not handcuffed. Moreover, there is no reason why the Officers would have handcuffed the defendant after determining that he did not have any weapons simply to walk 30 to 75 feet to the muster room, where it is uncontested that the defendant was not handcuffed.

---

[1] However, Ms. Santiago's testimony that she saw the defendant in handcuffs at the reception desk before he was taken upstairs is consistent with the defendant's testimony that after the firearm was retrieved at his residence, he was taken back to the 32nd Precinct in handcuffs and taken upstairs to an interrogation room. See Tr. 222-23. Thus, it is possible that Ms. Santiago saw the defendant when he returned to the precinct, at which point he had been arrested, rather than when he first arrived and went to the muster room. In any event, it is not credible that Ms. Santiago saw the defendant in handcuffs when he went to the muster room.

Nothing else about the conversation in the muster room suggests that it constituted a de facto arrest. Far from an interrogation room, the muster room is a large room, with windows, vending machines, computers, and a photocopier. See GX G, K. The defendant's conversation with the Officers lasted only 30 minutes, including the time needed to retrieve the consent to search form, explain the form to the defendant, and have the defendant and the three NYPD representatives sign it. At no time did the Officers draw their weapons or otherwise use force on the defendant. See United States v. Wiggan, 530 F. App'x 51, 54 (2d Cir. 2013); United States v. Torres, 949 F.2d 606, 608 (2d Cir. 1991) ("[W]e do not believe that a law enforcement agent's request to step inside a police office without more transforms an otherwise consensual encounter into a fourth amendment seizure."). The defendant never requested to leave the muster room, and, up to the point that he was handcuffed after signing the consent to search form, there is no evidence that he was not free to leave. Tr. 41, 131.

Moreover, the defendant's argument for suppression fails because any detention in the muster room would have been a lawful detention under the Fourth Amendment because it was supported by probable cause based on the Snapchat video and the evidence that the defendant was a felon who had been in possession of a firearm in violation of 18 U.S.C. 922(g)(1).

14

"Probable cause exists if at the time of the arrest 'the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010) (quoting Beck v. Ohio, 3798 U.S. 89, 91 (1964) (brackets omitted)). The Second Circuit Court of Appeals has explained that "information gleaned from informants can be sufficient to justify the existence of probable cause." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (discussing arrest pursuant to N.Y. Agric. & Mkts. Law § 353). Moreover, the Court of Appeals has recognized that a tip from a known informant whose reputation can be assessed and who can be held responsible for fabricated assertions is especially significant in establishing probable cause. Id. And "information provided by 'an identified bystander with no apparent motive to falsify' has 'a peculiar likelihood of accuracy,'" Id. (quoting Caldarola v. Calabrese, 298 F.3d 156, 163 (2d Cir. 2002)).

When the Officers moved the conversation to the muster room, the Officers had a video of the defendant, who admitted that he was the man in the video, blowing what appeared to be marijuana smoke into a dog's mouth. In New York, it is a misdemeanor to "unjustifiably administer[] any poisonous or noxious drug or substance to an animal," N.Y. Agric. & Mkts. Law

§ 360, "or in any way [to] further[] any act of cruelty to any animal," id. § 353. Marijuana is a controlled substance in New York, and it was reasonable for the Officers to believe that forcibly administering marijuana to a dog would violate Sections 353 and 360 of the New York Agriculture and Markets Law. The Officers explained that, based on the evidence in the Snapchat video, the defendant appeared to be blowing marijuana smoke into the mouth of a dog. Tr. 10-14, 110. When confronted with the video, the defendant asked for the opportunity to inform his parole officer, which would have been unnecessary if he had not committed a crime. The Officers therefore had probable cause to arrest the defendant. Panetta, 460 F.3d 388, 396 (2d Cir. 2006).

Nor does the defendant's argument that the Officers did not actually intend to arrest him based on the Snapchat video compel a different result. The Supreme Court has explained that a police officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004). Rather, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." Id.

The defendant cites Knowles v. Iowa, 525 U.S. 113, 114 (1998) for the proposition that once the Officers had decided not to arrest him based on the Snapchat video, any further

search or detention violated the defendant's rights under the Fourth Amendment. But Knowles does not support that contention. In Knowles, the Supreme Court held only that where a motorist is pulled over for speeding and issued a citation but not arrested, a police officer may not conduct a full search of the vehicle as if there had been a custodial arrest. Id. But the Officers did not search the defendant in the muster room, and there is therefore no issue of the legality of a search incident to arrest where officers have decided not to arrest a person.

Moreover, the Officers also had probable cause to believe that the defendant had unlawfully possessed a weapon in violation of 18 U.S.C. 922(g)(1), the offense the defendant contends the Officers were subjectively focused on, because the Officers had received a credible, partially corroborated tip from a known source who reported an eye witness identification of the defendant in possession of a firearm, and the Officers knew that the defendant was a convicted felon. At least one court in this district has found probable cause that a defendant violated 18 U.S.C. § 922(g)(1) based on a known informant's tip that the defendant, a known felon, possessed a firearm where the police were able to verify the informant's description of the defendant's residence, confirm that the defendant lived there, and where the informant's "statements were consistent with information [the police officer] had already received from other

law enforcement officers and cooperating witnesses." United
States v. McDaniel, No. 03-cr-550, 2003 WL 22025872, at *1-6
(S.D.N.Y. Aug. 29, 2003) (holding that the informant's tip
"coupled with knowledge of Defendant's prior felony convictions,
entitled the detaining officers to believe that Defendant had
violated Title 18 of the United States Code, section
922(g)(1).");  see United States v. Doyle, 720 F. App'x 271, 276
(6th Cir. 2018) (probable cause to arrest for violation of 18
U.S.C. 922(g) existed where eye witness reported the defendant
threatened her with a gun and pointed the defendant out to
police, who corroborated the witness's description and confirmed
the owner of the vehicle the defendant was driving was a
convicted felon);  see also Illinois v. Gates, 462 U.S. 213,
244-45 (1983) (anonymous tip, once corroborated, may create
probable cause sufficient to issue a warrant);  Panetta, 460 F.3d
at 395.

The defendant's motion to suppress the evidence based on a
violation of his rights under the Fourth Amendment with respect
to either the Terry stop in the waiting area or the subsequent
conversation in the muster room is therefore **denied**.

## C.

The defendant also moves to suppress the incriminating
statements he made in the muster room before he had received
Miranda warnings because, he argues, the statements were the

product of a custodial interrogation and were taken in violation of the Fifth Amendment's requirement that he receive _Miranda_ warnings before such an interrogation.

Generally, police officers must advise a suspect of the suspect's _Miranda_ rights before the suspect is subjected to a "custodial interrogation." _United States v. FNU LNU_, 653 F.3d 144, 148 (2d Cir. 2011). In this case, the questioning in the muster room was plainly an "interrogation," which "consists of express questioning or its functional equivalent," and the relevant inquiry is therefore whether the defendant was in "custody" for purposes of _Miranda_. _Id._ (internal quotation marks omitted). "[T]he overarching custody question is whether a reasonable person in the suspect's position would have understood' [himself or] herself to be subjected to restraints comparable to those associated with a formal arrest." _Id._ at 153 (internal quotation marks and brackets omitted). In _FNU LNU_, the Second Circuit Court of Appeals explained that the factors relevant for determining whether a suspect is in custody during questioning include the duration and location of the questioning, whether the suspect volunteered for the questioning, whether restraints were used, whether weapons were present, and especially whether they were drawn, and whether the suspect was told the suspect was free to leave. _Id._

In this case, the defendant was not in custody in the muster room for Miranda purposes. The muster room, which is a large room with windows, vending machines, computers, and tables, is not a location where a suspect would reasonably believe that the person was not free to leave or was under formal arrest. The Officers questioned the defendant in the muster room for only 30 minutes and did not draw their weapons or otherwise make any display of force. Nor, as discussed above, did the Officers handcuff the defendant prior to the conversation in the muster room. The credible testimony indicates that the defendant voluntarily went to the muster room in an effort to continue the conversation about the Snapchat video and to convince the Officers to allow him to inform his parole officer about the issue. While the defendant was not advised about his right to leave, he never requested to leave the muster room. Under all the circumstances, the defendant was not subjected to restraints comparable to a formal arrest. See, e.g., California v. Beheler, 463 U.S. 1121, 1125 (1983) ("[W]e have explicitly recognized that Miranda warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.") (internal quotation marks omitted); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (30-minute interview in police officer's closed office was not a custodial interrogation

where the suspect voluntarily went to the police station and was told he was not under arrest). The Officers were therefore not required to advise the defendant of his Miranda rights prior to the time when the defendant made incriminating statements in the muster room.

The defendant's motion to suppress the statements he made in the muster room is therefore **denied.**

**D.**

The defendant also moves to suppress the firearm discovered at his residence, arguing that he did not voluntarily sign the consent to search form at the 32nd Precinct.

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, [Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)], and is a question of fact to be determined from all of the surrounding circumstances." United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988). And "neither the fact that a person is in custody nor that [the person] has been subjected to a display of force rules out a finding of voluntariness." United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012).

Although the defendant does not dispute that he signed a consent to search his residence, the defendant argues that this consent was not given voluntarily because the Officers threatened to obtain a search warrant if he did not provide his consent and advised him that there could be consequences for Ms. Santiago and Ms. Santiago's child if either were present when the firearm was eventually recovered. However, the fact that the defendant was faced with a difficult decision does not mean that his decision was not the product of an "essentially free and unconstrained choice." Arango-Correa, 851 F.2d at 57; United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (consent to search voluntary even though previously a "heavily armed SWAT team . . . initially secured [a couple] in handcuffs and raised the possibility of taking the couple into custody while placing [the consenter's] young daughter in protective care"). At the evidentiary hearing, the defendant conceded that the Officers asked him to sign the consent form. Tr. 203. The defendant testified that he understood what the form said, but then backtracked less credibly and testified that he did not understand "clearly." Tr. 203. He did, however, concede that he told the Officers that they could come and get the firearm from his residence. Tr. 203. While the defendant characterized this as a "[b]ad decision with good intentions," it was his decision

nonetheless. The single-page consent to search form that the defendant signed itself also states:

> I have been advised of my right to refuse to consent before any search is conducted. I understand that I have the right to revoke such consent, in whole or in part, at any time.

> I am giving my consent knowingly, voluntarily and intelligently and without threats or promises of any kind.

GX E. The defendant also disputes Officer Wadolowski's testimony, which the Court finds credible, that Officer Wadolowski read the consent to search form to the defendant before the defendant signed it.[2] While "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness," Garcia, 56 F.3d at 422, the defendant plainly had that knowledge. Moreover, when the Officers reached the defendant's residence, the defendant provided his keys to the Officers, further demonstrating the defendant's consent.

Because the totality of the circumstances demonstrates that the defendant voluntarily consented to the search of his residence, the defendant's motion to suppress the firearm recovered during that search is **denied.**

---

[2] The defendant also testified that he is able to read and write English and therefore could have chosen to read the consent to search form, which contains less than ten lines of plainly worded text, himself. Tr. 205.

**E.**

Finally, the defendant moves to suppress the second statement that he gave in an interrogation room in the 32nd Precinct after he was formally arrested and advised of his Miranda rights. The defendant argues that this second statement was the product of a deliberate two-step circumvention of Miranda's requirement of prophylactic warnings by the Officers, whereby his first statement, made without Miranda warnings, was used to obtain the second statement, which the defendant made after receiving those warnings. See Missouri v. Seibert, 542 U.S. 600, 613-14 (2004); Oregon v. Elstad, 470 U.S. 298, 313 (1985).

The defendant's argument is unavailing because, as explained above, the defendant's first statement was not the product of a custodial interrogation and therefore there was nothing to "circumvent." United States v. Moore, 670 F.3d 222, 228-29 (2d Cir. 2012). Moreover, there is no indication that the Officers deliberately circumvented any such initial requirement. As the Supreme Court explained in Elstad:

> A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Elstad*, 470 U.S. at 314. However, in *Seibert*, where the police intentionally withheld *Miranda* warnings until the suspect provided incriminating information and only then provided those warnings before confirming the suspect's initial statements, the Supreme Court found that the suspect's rights under the Fifth Amendment had been violated. *Seibert*, 542 U.S. at 604-05. The Second Circuit Court of Appeals has interpreted these decisions as creating an exception to the "ordinary" rule that subsequent *Miranda* warnings "suffice to remove the conditions that precluded admission of the earlier statement," *Elstad*, 470 U.S. at 314, where the police deliberately circumvent the first set of *Miranda* warnings. *Moore*, 670 F.3d at 228. In such a case, the Government must demonstrate by a preponderance of the evidence, "in light of the totality of the objective and subjective evidence, that it did not engage in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights." *Id.* at 230.

The objective and subjective evidence in this case demonstrates that the police officers did not use a deliberate two-step process to circumvent the defendant's *Miranda* rights. First, the defendant made his second statement at least 90 minutes after his initial statement in the muster room, which he gave prior to 10:25 a.m., when he signed the consent to search form. *See Moore*, 670 F.3d at 231 (duration of 90 minutes between

the two statements, among other factors, "decidedly points against concluding that the government engaged in a deliberate two-step process"); United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007) ("over an hour" between first and second statements weighed against suppression). And while Officer Wadolowski was present for both statements, the second interview was conducted entirely by a detective, who had not been present for the defendant's initial statements in the muster room. Additionally, the defendant was provided with food, soda, and a cigarette (as well as being advised of his Miranda rights) prior to giving the second statement, providing further objective evidence that the second statement was both knowing and voluntary. See Elstad, 470 U.S. at 309.

There is no evidence that any of the officers subjectively attempted to conduct a two-step process to circumvent the requirements of Miranda. Indeed, Sergeant Martinez demonstrated a subjective intent to preserve the defendant's Miranda rights. When the gun was recovered at the defendant's apartment, the defendant initially tried to engage Sergeant Martinez in conversation, but Sergeant Martinez refused to talk to the defendant because once he had confirmed that the defendant possessed a gun "any other conversations that we were going to have with regards to that firearm, I wanted [the defendant] to be Mirandized in the detective squad office." Tr. 135. Both

objectively and subjectively, the Government has shown that the police officers in this case did not employ a deliberate two-step process in order to deprive the defendant of his Miranda rights.

Therefore, the defendant's motion to suppress the statements he made in the interrogation room in the 32nd Precinct after he was advised of his Miranda rights is **denied**.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to suppress the statements he made in the muster room and in the interrogation room, as well as the physical evidence recovered from his residence, is **denied.**

**SO ORDERED.**

**Dated:**     **New York, New York**
          **June 15, 2018**

                                        John G. Koeltl
                                        United States District Judge